IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 1, 2015

## STATE OF TENNESSEE v. JOHN G. APFEL aka RAYMOND DEBARTOLOMIES

**Direct Appeal from the Circuit Court for Lawrence County
No. 31463     Stella L. Hargrove, Judge**

---

**No. M2015-00944-CCA-R3-CD – Filed August 10, 2016**

---

A Lawrence County Circuit Court Jury convicted the Appellant, John Apfel aka Raymond DeBartolomies, of theft of $1,000 or more but less than $10,000. The trial court imposed a sentence of four years. On appeal, the Appellant challenges the sufficiency of the evidence supporting his conviction, the trial court's denial of alternative sentencing, and the amount of restitution imposed. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA McGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brandon E. White, Columbia, Tennessee (on appeal), and R.H. Stovall, Jr., Pulaski, Tennessee (at trial), for the Appellant, John G. Apfel aka Raymond DeBartolomies.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Christi L. Thompson and Gary Howell, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

### I. Factual Background

The Appellant's charges stem from his receipt of Supplemental Security Income (S.S.I.) benefits from the Social Security Administration from May 2009 to May 2011

when he was not old enough to receive such benefits. The Appellant, who was born on May 2, 1946, assumed the identity of a deceased child, Raymond DeBartolomies, whose date of birth was October 29, 1940. The Appellant used the identity of Raymond DeBartolomies for approximately thirty years. In 2002, when Raymond DeBartolomies would have been sixty-two years old, the Appellant applied for Social Security retirement benefits. In 2005, when Raymond DeBartolomies would have been sixty-five years old, the Appellant applied for Social Security needs-based benefits, which were granted based on his age.

At trial, Mark Keeton, an employee with the Social Security Administration, testified that on October 15, 2002, the Appellant, using the name Raymond DeBartolomies, filed for retirement benefits. Keeton took the application either in person or by telephone. To prove that he was age-eligible for benefits, the Appellant provided a Delaware birth certificate for Raymond DeBartolomies reflecting a birth date of October 29, 1940.

Keeton said that on October 28, 2005, the Appellant, again using the name Raymond DeBartolomies, applied for S.S.I. benefits. According to Social Security records, Raymond DeBartolomies's birth certificate was used to establish the Appellant's date of birth. Keeton said that the birth certificate came from either the file for the 2002 application or was another copy that was submitted with the S.S.I. application.

Keeton explained that Social Security retirement benefits were based on the applicant's work history and the "F.I.C.A." taxes paid and that a person must be at least sixty-two years of age before receiving retirement benefits. To qualify for S.S.I., a "needs based program," a person must have a low income and must be (1) disabled, (2) blind, or (3) at least sixty-five years of age. Keeton stated that a person could potentially draw both Social Security retirement benefits and S.S.I. benefits.

Keeton reiterated that when the Appellant applied for S.S.I. in 2005, he stated that he was sixty-five years old and that he was born in 1940. Keeton stated that in 2005, a person born in 1946 would not have been eligible for S.S.I. unless that person was disabled or blind. The Appellant's application made no claim of disability or blindness. Keeton explained that at age sixty-five, S.S.I. benefits were based on age, not disability.

On cross-examination, Keeton said that the Appellant received approximately $6,177 in S.S.I. benefits from 2009 to 2011 and that the benefits were paid because of the Appellant's fraud. The Appellant received over $51,000 in retirement and S.S.I. benefits, but the charges were based on the S.S.I. benefits he received.

Keeton said that he spoke with the Appellant during the 2002 application for retirement benefits. Keeton verified that Raymond DeBartolomies had "earnings for

1986 through 1997," which qualified him for retirement benefits. Keeton asserted that the Social Security Administration had never processed a disability claim for anyone using the name Raymond DeBartolomies.

On redirect examination, Keeton said that because the Appellant filed for retirement benefits at age sixty-two, his benefits were reduced by about twenty-five percent. If the Appellant had qualified for disability benefits, he would have received the full amount. Keeton reiterated that the Appellant received S.S.I. because he claimed he was sixty-five years old and proved it with a birth certificate.

On recross-examination, Keeton acknowledged that the Appellant paid Social Security taxes as Raymond DeBartolomies for at least ten years while he was working. In 1993, the Appellant, using the name John Apfel, requested a replacement Social Security card but never filed a claim for Social Security benefits using that name.

Thomas Goldman, a special agent with the Social Security Administration's Office of the Inspector General, testified that his office was tasked with finding fraud, waste, abuse against programs, and employee misconduct within Social Security. The office received a request from the United States Attorney's Office in Birmingham, Alabama, to investigate whether John Apfel was using a different name and date of birth to draw Social Security benefits.

Agent Goldman searched the Social Security system and found names, dates of birth, and Social Security numbers for John Apfel and Raymond DeBartolomies. A different date of birth and Social Security number were associated with each name, which led him to believe they were "separate people." According to Social Security records, a Social Security card was issued to John George Apfel in 1963 when he was seventeen years old; the application reflected that his date of birth was May 2, 1946. Agent Goldman said that in the 1960s, Social Security numbers were usually issued when an individual started to work. A Social Security card was issued to a person using the name Raymond DeBartolomies in 1988 when he was forty-seven years old. A Delaware birth certificate included with the application reflected that Raymond DeBartolomies was born on October 29, 1940. Agent Goldman said that it was unusual for a person's first Social Security card to be issued when the person was forty-seven years old. Agent Goldman learned that someone using the name Raymond DeBartolomies lived in Leoma, Tennessee, and that he was drawing Social Security retirement benefits and S.S.I. benefits.

Agent Goldman said that from May 2009 to May 2011, a person using the name Raymond DeBartolomies received $6,177.43 in S.S.I. benefits.

On cross-examination, Agent Goldman said that although the Appellant had been issued Social Security cards in two names, he did not "pa[y] in" under both names at the same time and did not receive benefits under both names. Agent Goldman asserted that the Appellant "defrauded the Government . . . by drawing . . . at an age that was inappropriate for drawing the benefits."

Kim McGee, the victim witness coordinator with the district attorney general's office, testified that at a trial on June 22, 2011, the Appellant testified that his name at birth was John Apfel and that he later changed his name to Raymond DeBartolomies because "he had been in some criminal activity." The Appellant implied that the Federal Bureau of Investigation (FBI) changed his name.

On cross-examination, McGee said that the Appellant alluded to being in the witness protection program. She acknowledged that the Appellant appeared to have been in "the Mob."

Kayla McClaren, a record keeper at Capital Bank, identified bank statements from the checking account of Raymond and Ramona DeBartolomies from 2009 to 2011. McClaren said that she had waited on a person who identified himself as Raymond DeBartolomies at the bank, and she identified him in court as the Appellant.

On cross-examination, McClaren said that she had worked for the bank for almost six years and that she had known the Appellant by the name Raymond DeBartolomies, not by the name John Apfel. The bank statements of Raymond DeBartolomies reflected that he received benefits from the Social Security Administration.

Lieutenant Jamie Mahar, a jail administrator with the Lawrence County Sheriff's Department, testified that when the Appellant was booked into jail, his fingerprints were taken. The fingerprints were put on a card bearing the Appellant's name and date of birth. The Appellant told the officers that his name was Raymond DeBartolomies and that his date of birth was October 29, 1940. Lieutenant Mahar identified the Appellant in court as the person who said his name was Raymond DeBartolomies.

On cross-examination, Lieutenant Mahar said that the Appellant was booked in the jail on December 8, 2014, on charges of driving on a revoked license and leaving the scene of an accident. The Appellant never told the officers that his name was John Apfel.

Kenneth Blue, an expert in fingerprint analysis with the Tennessee Bureau of Investigation (TBI), testified that he was given three sets of fingerprints for comparison. The first set was taken from "Robert Norton, a.k.a. John Apfel, [after] an arrest in 1976 in South Placerville, California." The second set was taken from a person who identified himself as Raymond DeBartolomies after he was arrested in Lawrenceburg, Tennessee.

The third set was taken from John G. Apfel after an arrest in Titusville, Florida, on August 29, 1981.  Blue determined that all three sets of fingerprints matched and that Robert Norton, John Apfel, and Raymond DeBartolomies were the same person.  Blue said that the fingerprint records reflected that during the Florida arrest, the person gave the name John G. Apfel and stated that his date of birth was May 2, 1946.

On cross-examination, Blue said that the name associated with the California fingerprints was "John G. Apfel, a.k.a Robert Norton."  The date on the Florida fingerprint card was May 31, 1985.

As the first defense witness, the Appellant called Loretto Police Chief Bobby Joe Killen.  Chief Killen said that he knew the Appellant as Raymond "Dutch" DeBartolomies and that he had known the Appellant for approximately twenty-seven years.  During that time, the Appellant had never used another name.  The two men had fished, played pool, and attended church together.

Lawrence County Assessor of Property Barbara Kaiser testified that her office did not have any records under the name John Apfel.  A property in Leoma had been registered in the name of Raymond DeBartolomies since June 14, 2000.  Kaiser said that she did not know the Appellant personally.

Tara Dickey, the Chief Deputy for the Lawrence County Register of Deeds, testified that she had searched the records in her office and had found no records related to John Apfel.  On June 15, 2000, a warranty deed for property owned by Raymond and Ramona DeBartolomies was recorded.

Kiley Weathers,[1] the Lawrence County Trustee, testified that he had been the Trustee since 2010.  The Appellant, whom he knew as Raymond DeBartolomies, paid taxes, lived in Lawrence County, and was on a "tax relief program."  His office had no records for anyone named John Apfel.  The office records for Raymond DeBartolomies dated back to 2001.

On cross-examination, Weathers testified that "[t]he State has a program where if you meet the income requirements and you're either on Social Security or – Social Security with the age requirement, or disability, or veteran, you can draw relief from the State."  He said that a person had to be at least sixty-five years of age to qualify under the "age requirement."  The Appellant was already on the program when Weathers was elected in 2010.

---

[1] We note that the court reporter incorrectly referred to this witness as "Carrie" and "Callie."

- 5 -

On redirect examination, Weathers did not know the exact date the Appellant was placed in the program. He stated that the Appellant walked with a cane each time he came into the trustee's office.

Anita Dawn Pilkington testified that she worked as an office manager for Dr. Homer L. Staley. The Appellant, whom she knew as Raymond DeBartolomies, had been Dr. Staley's patient since 2007. The Appellant was treated for diabetes, back pain, and a heart condition. She said that the Appellant had never used another name.

On cross-examination, Pilkington said that the Appellant was a Medicare patient.

Ramona DeBartolomies testified that she met the Appellant in 1985 and that they were married in 1987. When they met, the Appellant went by the name Raymond DeBartolomies. At the time of trial, they had been separated for two years. They had two children, and the children's last name was DeBartolomies. Mrs. DeBartolomies explained that she did not know the Appellant's name was John Apfel until 1986 when the Appellant got a job and gave his employer a Social Security number. The employer "sent back a letter about two months later saying that was not his Social Security number." She said that they did not have a conversation about the name change because she was "not confrontational."

Jessie DeBartolomies, the Appellant's twenty-five-year-old son, testified that he and his brother, John Robert DeBartolomies, had always used the last name DeBartolomies. In 2001, Jessie DeBartlolomies met the Appellant's "side of the family" and learned that the Appellant's last name was Apfel. The Appellant explained that he changed his name because of his "rocky past."

The Appellant testified that his birth name was John G. Apfel and that he was born on May 2, 1946, in Hoboken, New Jersey. He was convicted of murder in New Jersey and received a sentence of life imprisonment, but his conviction was reversed on appeal. Rather than risk another trial, the Appellant pled guilty on November 3, 1980, to "Accessory After the Fact, Aiding and Abetting" and received a sentence of three years. In exchange, he testified against a member of "the Mob." The Appellant said that he also "turned a lot of people in from losing a lot of money." The people were members of a "syndicate organization."

The Appellant said that after he pled guilty, he "[w]alked out scot free . . . no parole, no nothing, no anything." The FBI offered to place him in the witness protection program, but he declined because he did not trust the FBI and thought he could protect himself better than the FBI. The Appellant said that he "did what was necessary." He paid $1,000 to take the name of a child who had died at birth in Wilmington, Delaware. The child was born on October 29, 1940, and was named Raymond DeBartolomies. The

Appellant began using the name Raymond DeBartolomies exclusively around 1984 when he began working for his wife's uncle in Tennessee. The Appellant acknowledged that he had used other names.

The Appellant said that he gave his children the name DeBartolomies to protect them from members of "the Mob." He used the name DeBartolomies when he bought property in 2000 because "Apfel was no longer in [his] brain." The Appellant said that he had no doubt he would be killed by "the Mob" if his true identity were ever known. The Appellant said that he did not adopt the name Raymond DeBartolomies with the intention of defrauding the Social Security Administration.

The Appellant said that after he fell in a ditch and hurt his back, he became disabled and unable to work. He also had back problems, diabetes, a heart condition, and esophageal cancer.

On cross-examination, the Appellant said that he "didn't pay much attention" to the six-year difference in his and Raymond DeBartolomies's birth date until the Social Security Administration notified him that he "had the wrong number." The Appellant explained that he did not read well. Nevertheless, he acknowledged that he knew how old he was and how old Raymond DeBartolomies was.

The Appellant said that after he was released in New Jersey, he went to Florida. He was arrested while he was in Florida. He did not tell the Florida authorities his real name, but they learned from his fingerprints that he was John Apfel.

The Appellant said that he was drunk when he applied for retirement benefits in 2002 as Raymond DeBartolomies. He acknowledged that he was not old enough to receive benefits when he applied. He stated that he had been arrested twice "in the past two months" for driving under the influence (DUI).

On redirect examination, the Appellant said that he thought he was "entitled to draw out" S.S.I. benefits because he had "paid into Social Security in the past." He thought S.S.I. benefits were the same as or similar to worker's compensation and that he was entitled to payment after he was hurt. The Appellant again asserted that he did not intend to apply for and receive benefits for which he was not eligible.

Defense counsel recalled Jessie DeBartolomies, who testified that he had helped with his parents' financial responsibilities for the past three years. The Appellant received S.S.I. payments "to cover the cost of living between his actual retirement and the actual mandated cost of living." During the time the Appellant received S.S.I. payments, the family informed the Social Security Administration when Mrs. DeBartolomies was working and when she was drawing unemployment, which affected

the amount the Appellant received. Jessie DeBartolomies said that his father never lied to the Social Security Administration about his income.

The jury convicted the Appellant of the charged offense of theft of $1,000 or more but less than $10,000. The trial court imposed a sentence of four years. On appeal, the Appellant challenges the sufficiency of the evidence supporting his conviction, the trial court's denial of alternative sentencing, and the amount of restitution imposed.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. "Effective consent" is defined as "assent in fact, whether express or apparent, including assent by one legally authorized to act for another." Tenn. Code Ann. § 39-11-106(a)(9). However, "[c]onsent is not effective when . . . [i]nduced by deception or coercion[.]" Id. at (a)(9)(A). In pertinent part, Tennessee Code Annotated section 39-11-106(a)(6)(A) provides that a deception is committed when a person knowingly:

(i) Creates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe to be true;

. . . .

(iii) Fails to correct a false impression of law or fact the person knows to be false and:

(*a*) The person created; or

(*b*) Knows is likely to influence another;

. . . .

(v) Employs any other scheme to defraud . . . .

Theft of $1,000 or more but less than $10,000 is a Class D felony. Tenn. Code Ann. § 39-14-105(a)(3).

In the light most favorable to the State, the proof adduced at trial revealed that the Appellant was born on May 2, 1946, and was named John Apfel.  Around 1984, he began using the identity of Raymond DeBartolomies who was born in 1940.  According to the Appellant, he changed his name to avoid retaliation from "the Mob."

In 2002, the Appellant applied for Social Security retirement benefits using the name Raymond DeBartolomies.  In order to prove his age, the Appellant supplied Social Security with Raymond DeBartolomies's birth certificate, which reflected he was born in 1940.  After verification that Raymond DeBartolomies had "paid into" Social Security for at least ten years, the Appellant was awarded retirement benefits.  In 2005, the Appellant applied for S.S.I. benefits.  The Appellant acknowledged that he knew how old he was at the time he applied for S.S.I. benefits.  At the time he applied, he was not disabled, blind, or sixty-five years old.  S.S.I. benefits were awarded because the Appellant met the income requirement and because the Appellant provided a birth certificate showing that he was at least sixty-five years old.  From May 2009 to May 2011, the Appellant received $6,177.43 in S.S.I. benefits.

On appeal, the Appellant contends that he did not act with intent to deprive the Social Security Administration, noting that he lived for thirty years "openly and notoriously as Raymond DeBartolomies."  The Appellant acknowledges that he obtained

S.S.I. benefits from May 2009 to May 2011 based on age. The Appellant contends, however, that if the Social Security Administration had asked if he was disabled, he would have responded in the affirmative and adduced proof of his disabilities. The Appellant asserts that because Social Security did not provide him with an opportunity to prove his disabilities, the administration effectively consented to pay him benefits. He argues that he did not receive benefits as John Apfel, that he received benefits as Raymond DeBartolomies, and that he contributed to Social Security under the name Raymond DeBartolomies. He further argues that his health issues "negated the need" for him to deceive Social Security in order to receive S.S.I. benefits. He asserts that

> [t]he fact that the Social Security Administration accepted Mr. DeBartolomies' application in 2005 for S.S.I. benefits based on an incorrect age is irrelevant when juxtaposed with the fact that Mr. DeBartolomies could have, if only he had been asked by the Social Security Administration to do so, simultaneously applied for S.S.I. benefits as a result of his ongoing debilitating health problems.

The State responds that the Appellant's attempt to "shift the focus from his deceit to his alleged medical disability by faulting the [Social Security Administration] for not inquiring into whether he had a disability that would have entitled him to relief" was disingenuous. The State notes that the Appellant sought S.S.I. benefits based on age, not disability. The State contends that the Appellant knowingly misrepresented himself to the Social Security Administration while being aware that he was not eligible for "age-based benefits" and that he received over $1,000 in benefits with the intent to deprive Social Security of the funds. We agree with the State.

The proof adduced at trial reflects that Social Security's "consent" was not effective because it was based upon the Appellant's deception, i.e., his providing proof that he was six years older than he was. Further, the Appellant's "intent to deprive an owner of property can be established by circumstantial evidence." State v. Demetrie Owens, No. M2003-01454-CCA-R3-CD, 2004 WL 2775459, at *5 (Tenn. Crim. App. at Nashville, Dec. 3, 2004) (citing State v. Scates, 524 S.W.2d 929, 931 (Tenn. 1975)). We conclude that the jury could have inferred the Appellant's intent to deprive Social Security of funds from the facts adduced at trial.

The Appellant also argues that the State adduced insufficient proof that he stole S.S.I. benefits in May 2011 because he was sixty-five in May of 2011 and was "otherwise eligible for S.S.I. benefits." The indictment alleged that the Appellant committed theft of $6,177.43 in S.S.I. benefits between May 2009 and May 2011. The indictment further alleged that the amount taken was $1,000 or more but less than $10,000. At trial, Agent Goldman testified that the Appellant, using the name Raymond DeBartolomies, received

$6,177.43 in S.S.I. benefits from May 2009 to May 2011. Accordingly, we conclude that the evidence is sufficient to sustain the Appellant's conviction for theft of $1,000 or more but less than $10,000.

## B. Sentencing

At the sentencing hearing, the parties agreed that the Appellant was a Range I offender convicted of a Class D felony; therefore, he was subject to a sentence of no less than two years and no more than four years. The parties further agreed that the amount stolen was $6,177.43.

Beth Ladner, who prepared the Appellant's presentence report, testified that he had a conviction of misdemeanor assault in Florida in 1964, for which he received a one-year probationary sentence. On the same day, the Appellant pled guilty to burglary, a felony offense for which the Appellant received a sentence of split confinement. In 1981, the Appellant was convicted of two felony offenses: larceny and burglary of a dwelling. In 1984, he was convicted of aiding and abetting murder, which was also a felony offense. The Appellant had been convicted of three counts of DUI, driving on a revoked license, vandalism, four counts of theft, failure to appear, assault, and a traffic offense. Collectively, the Appellant had been convicted of four felony offenses and thirteen misdemeanors. Ladner said that the Appellant confirmed the convictions.

Ladner acknowledged that the Appellant's last conviction occurred in 1994. The Appellant informed Ladner that his mental health was good but that he felt he had the early stages of dementia and that he suffered from "light depression and anxiety." The Appellant reported poor physical health and said that he had artery disease, basal cell carcinomas, a degenerative disk disease, Barrett's esophagus, and high blood pressure. The Appellant also reported that he had bypass surgery in 2006.

Agent Goldman testified that the administration became aware of a "glitch" involving the names of John Apfel and Raymond DeBartolomies in 2013. Agent Goldman maintained that the amount improperly paid to the Appellant was over $51,000. Agent Goldman stated that $6,177.43 was "the amount that was paid going back to the beginning of the statute of limitations until he actually reached the proper age when we would have paid him benefits."

On cross-examination, Agent Goldman stated that $51,000 was the amount of retirement benefits and S.S.I. benefits that had been paid to the Appellant since 2002. He acknowledged that the Appellant had never received benefits from Social Security as John Apfel. Agent Goldman estimated that the Appellant could receive $700 or $800 per month as John Apfel, however, the Appellant would not be entitled to Social Security retirement benefits while incarcerated.

The Appellant testified that he was sixty-eight years old. He said that he had "femoral artery bypasses," that he had heart problems, and that he took nitroglycerin tablets for his heart. The Appellant said that he took a number of other medications.

The Appellant said that he was willing to register as John Apfel for retirement benefits to pay his restitution but that he was "afraid that once those people in Hoboken, New Jersey, find out about me, you're looking at a dead person here." The Appellant said that he received approximately $400 per month in retirement benefits using the name Raymond DeBartolomies.

The Appellant said that he had no other income to pay restitution but that his sons had volunteered to help him.

The Appellant said that according to his "past record, I was a bad, bad, bad person." He stated, however, that when he moved to Tennessee and began raising his children, he "found the Lord," attended church, and was on "a straight, narrow road."

The Appellant stated that he had a charge in 2004 that was "retired without conviction" and that his last conviction was in 1994.

Jessie DeBartolomies, the Appellant's youngest son, testified that he was willing to pay $150 per month toward his father's restitution. He said that he made approximately $900 per month working at Walmart. He stated that the Appellant had open heart surgery in 2006.

John DeBartolomies, the Appellant's oldest son, testified that when he found a job, he would help his father pay restitution. He estimated that he would be able to pay $50 to $100 per month. He stated that his father's health problems were "real."

Anthony Corey testified that he and the Appellant had been good friends for more than thirty years. Corey said that he had helped the Appellant financially for a couple of years and that he was willing to pay $100 per month toward the Appellant's restitution. He stated that he and the Appellant attended the Church of Christ in Leoma and that the Appellant received help from the church. He said that the Appellant's health was poor.

The trial court noted that the Appellant had a substantial criminal history but that "it's old." The court stated that according to the presentence report, the Appellant had violated probation or parole on at least five occasions, which suggested that the Appellant was unable to abide by the terms of release.

The court stated that the prior convictions were the result of a successful "long time fraud." The court described the Appellant as "streetwise," cunning, clever, and "very proud of his Mafia history that he wanted this jury to be well aware of." The court said that the jury convicted the Appellant despite his attempts to "intimidat[e]" them by mentioning "the Mob."

The court noted that the Appellant had pending misdemeanor DUI charges, negating the Appellant's claim that he was "too old and too sick to commit crimes." The court said, "I think he wants me to know that the jail probably can't house him. I think otherwise."

The court opined that the Appellant was "cunning and clever enough to pull off another scheme." The court found that granting the Appellant probation would depreciate the seriousness of the offense. The court also stated that imposing a sentence of incarceration would serve as a deterrent.

The court stated that the Appellant did not accept responsibility; instead, "I think it's more a matter of getting caught." The court found that the Appellant was not credible and was a "boasting, bragger."

The trial court applied enhancement factor (1), citing the Appellant's history of criminal convictions and behavior. Tenn. Code Ann. § 40-35-114(1). The court applied mitigating factor (1), that the Appellant's criminal conduct neither caused nor threatened serious bodily injury. Tenn. Code Ann. § 40-35-113(1).

The court imposed a sentence of four years, denied alternative sentencing, and ordered restitution in the amount of $6,177.43.

On appeal, the Appellant contends that the trial court erred by denying alternative sentencing and by imposing restitution in the amount of $6,177.43.

### 1. Alternative Sentencing

The length, range, or manner of service of a sentence imposed by the trial court is to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct

involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The Appellant's sentence meets this requirement. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The Appellant was convicted of a Class D felony; therefore, he is

- 14 -

considered a favorable candidate for alternative sentencing. The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

On appeal, the Appellant acknowledges that he has a lengthy criminal history but argues that his convictions are "old," noting that his last criminal conviction was in 1994. The Appellant challenges the trial court's finding that incarceration was necessary to avoid depreciating the seriousness of the offense and contends that the record contains no proof to support the trial court's finding that he needs to be confined to deter others. Finally, the Appellant acknowledges that he violated probation in the past but again argues that the violations occurred many years ago. The Appellant complains that his health is poor and that if he were incarcerated, he would be unable to pay restitution.

The State responds that although the Appellant had not been convicted of an offense for twenty years, "he continued to engage in a 'clever' and 'cunning' scheme that involved deceiving others around him and [the Social Security Administration] during this time period." The State contends that the trial court correctly considered the Appellant's extensive criminal history, his past violations of probation, and his poor rehabilitative potential in denying alternative sentencing. We agree with the State.

First, we will address the Appellant's complaint that the trial court denied alternative sentencing because of the seriousness of the offense and the need for deterrence without making the necessary specific findings regarding those factors. Generally, to deny alternative sentencing on the basis of the seriousness of the offense, "'the circumstances of the offense as committed must be especially violent, horrifying,

shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006) (quoting State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997)). Also, to determine whether a trial court has properly found a need for deterrence, this court usually looks to State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), in which our supreme court specifically noted five factors for consideration when denying probation on the basis of deterrence. Recently, however, our supreme court noted in State v. Kyto Sihapanya, __ S.W.3d __, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *3 (Tenn. at Jackson, Apr. 30, 2014), that "the heightened standard of review [from Hooper and Trotter] that applies to cases in which the trial court denies probation based on only one of these factors is inapplicable" when the trial court "combined the need to avoid depreciating the seriousness of the offense with the need for deterrence and the nature and circumstances of the offense." This court has explained that according to Sihapanya,

> if only one factor found in Tennessee Code Annotated section 40-35-103(1) is utilized by the trial court, the trial court must make additional findings. If, however, the trial court bases the denial of alternative sentencing on more than one factor, we review the denial to determine if the trial court abused its discretion.

State v. Robert Allen Lester, Jr., No. M2014-00225-CCA-R3-CD, 2014 WL 5501236, at *5 (Tenn. Crim. App. at Nashville, Oct. 31, 2014), application for perm. to appeal denied, (Feb. 13, 2015).

In the instant case, the trial court found the presence of every factor in Tennessee Code Annotated section 40-35-103(1). The proof adduced at the sentencing hearing revealed that the Appellant had thirteen misdemeanor convictions and four felony convictions. Additionally, the Appellant had violated probation or parole on at least five occasions. Moreover, the Appellant lived under a false identity for over thirty years, deceiving friends, family, and the government. The trial court found that the Appellant was not credible and would have continued to defraud the government if he had not been caught. Further, the court found that the Appellant's rehabilitative potential was poor, maintaining that he did not accept responsibility for his crimes and that "he's cunning and clever enough to pull off another scheme." We conclude that the trial court did not abuse its discretion by denying alternative sentencing.

## 2. Restitution

The Appellant further contends that insufficient evidence exists regarding his theft of benefits for May 2011 because he turned sixty-five that month and was eligible based

on age to receive S.S.I. benefits. He contends, therefore, that the amount of restitution imposed by the trial court should be reduced.

Initially, we note that the Appellant failed to challenge the amount of restitution in the trial court and did not raise the issue in the motion for new trial. We are not required to address issues raised for the first time on appeal. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995).

Nevertheless, the record belies the Appellant's contentions. At the sentencing hearing, the Appellant agreed to the amount of restitution imposed. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); see also State v. Latarsha R. Wheeler, No. W2006-01001-CCA-R3-CD, 2007 WL 1757025, at *6 (Tenn. Crim. App. at Jackson, June 18, 2007) ("The defendant has waived any complaint by her lack of objection to and involvement in the trial court's choice of the restitution amount."). Moreover, at the sentencing hearing Agent Goldman testified that $6,177.43 was "the amount that was paid going back to the beginning of the statute of limitations until he actually reached the proper age when we would have paid him benefits. We stopped counting it at that point." Therefore, the restitution amount did not include any money the Appellant received after he became age-eligible for the benefits. Thus, the Appellant is not entitled to relief.

### III. Conclusion

Upon review, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE